**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DONNA PERRY-ANDERSON,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD UNIVERSITY HOSPITAL,<br><br>Defendant. | Civil Action No. 14-2111 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The plaintiff, Donna Perry-Anderson, brings this action against her former employer, Howard University Hospital ("HUH"), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, asserting two counts of failure to accommodate her disability. Compl. ¶¶ 27–28, 30, ECF No. 1. The plaintiff alleges that, after suffering a stress-induced stroke, she requested to be reassigned to a position in a less stressful environment or to return to her former position with a modified work schedule in order to accommodate her disability, but that her requests were denied by her employer. *Id.* ¶¶ 25–27. Pending before the Court is HUH's motion for summary judgment. Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 16. For the reasons laid out below, HUH's motion is denied.

## I. BACKGROUND

The plaintiff began working for HUH in or around September 1998, and over the next decade was repeatedly promoted to positions with increasingly more responsibilities. Pl.'s Statement of Material Facts in Dispute ("Pl.'s SMF") ¶¶ 1–2, ECF No. 18-1; Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 2 ("Pl.'s Dep.") at 29:14–15, ECF No. 18-2. On May 5, 2008, the plaintiff transferred to her last position as the executive assistant to HUH's CFO and Deputy CFO in the finance department. Pl.'s SMF ¶ 4; Def.'s Statement of Undisputed Material

Facts ("Def.'s SMF") ¶ 1, ECF No. 16-1. Concomitant with this new job, the plaintiff received a raise of $10,560.06 to a total annual salary of $60,000. Pl.'s SMF ¶ 5; Def.'s Mem., Ex. 1 at 1, ECF No. 16-3. In that position, the plaintiff "handled the day-to-day activities of the chief and deputy chief financial officer," including scheduling, maintaining correspondence, and overseeing five other administrative assistants. Def.'s Mem., Ex. 3 ("Pl.'s Dep.") at 43:2–11, 103:2–9, ECF No. 16-3. The plaintiff's job responsibilities increased over time, until she was eventually placed on three committees, as she was being "groom[ed] to be a hospital administrator" by the Deputy CFO. *Id.* at 56:1–17, 103:12–18, ECF No. 16-3. In order to complete her increased assignments, the plaintiff alleges that she "frequently skipped lunch and rest breaks and worked longer than 8-hour work days, and sometimes worked weekends." Pl.'s SMF ¶ 7.

Due to these increased duties and longer work hours, in August 2009, the plaintiff began to suffer from physiological symptoms of stress. Pl.'s Dep. at 63:13–64:17, ECF No. 16-3. As a consequence, she "requested a transfer to a job where [she] could work eight hours." *Id.* at 64:2–4, ECF No. 16-3; Pl.'s SMF ¶ 8. She applied for a vacant position in a different department but her application was denied in favor of another person from the finance department. Pl.'s Dep. at 74:6–75:7, ECF No. 16-3. A month later, in October 2009, the plaintiff suffered a stress-induced stroke, resulting in her being placed on medical leave under the Family Medical Leave Act ("FMLA"). Def.'s SMF ¶ 2; Pl.'s SMF ¶ 10; Pl.'s Opp'n, Ex. 6 ("FMLA App.") at 40–41, ECF No. 18-3; *id.*, Ex. 7 (Pl.'s Emails with HUH HR, dated Nov. 11–13, 2009) at 42, ECF No. 18-3. On the FMLA application, submitted to HUH's Human Resources Department ("HR"), the plaintiff's neurologist listed the plaintiff's medical restriction as "needs [a] job with less stress,"

2

and her only limitation as "cannot work [more than] 40 hours per week." FMLA App. at 41;

Pl.'s Emails with HUH HR, dated Nov. 11–13, 2009, at 42.

On November 9, 2009, the plaintiff's neurologist medically cleared the plaintiff to return

to work on December 7, 2009, "[a]ssuming a transfer to a less stressful department has

occurred." Def.'s Mem., Ex. 2 (Letter from Pl.'s Neurologist, dated Nov. 9, 2009) at 2, ECF No.

16-3. Around this time, consistent with the plaintiff's neurologist's recommendation to seek

reassignment to a less stressful department, the plaintiff initiated conversations with the Director

of Risk Management regarding a new position in that department.[1] Def.'s Mem., Ex. 9 ("Dir.

Risk Management 30(b)(6) Dep.") at 17:12–18:17, ECF No. 16-3. The risk management

coordinator was on short-term disability leave at the time, and the Director considered the

plaintiff for a potential new position in her department as an administrative assistant. *Id.*

On November 29, 2009, however, the plaintiff suffered another health setback requiring a

brief hospitalization. Pl.'s SMF ¶ 18. A stroke was ruled out and, on December 2, 2009, the

plaintiff was cleared a second time to return to work on January 14, 2010, again, subject to "a

transfer to a less stressful department" at work. *Id.* ¶ 19; Def.'s SMF ¶ 5; Def.'s Mem., Ex. 4

(Letter from Pl.'s Neurologist, dated Dec. 2, 2009) at 39. Around this time, the plaintiff

indicated to HR that she intended to return, not to her previous position in the finance

department, but to a new position, potentially in Risk Management. Pl.'s Opp'n, Ex. 16 (Pl.'s

Email to HUH HR, dated Dec. 10, 2009) at 3, ECF No. 18-5. In response, however, HR

informed the plaintiff that such a transfer to Risk Management might not occur after all, which

---

[1]       The parties appear to use "Risk Services" and "Risk Management" interchangeably when referring to the same department. *Compare* Dir. Risk Management 30(b)(6) Dep. at 11:4-7 *and* Pl.'s Opp'n, Ex. 24 at 14, ECF No. 18-5 (referring to the department as Risk Management) *with* Dir. Risk Management 30(b)(6) Dep. at 40:17-20 *and* Def.'s Mem., Ex. 20 at 89, ECF No. 16-3 (referring to the department as Risk Services). For consistency, the Court will use "Risk Management" to refer to this HUH department because that is the name used most often by the parties.

news was confirmed by the Director of Risk Management by telephone. Pl.'s Opp'n, Ex. 17 (Pl.'s Email to Dir. of Risk Management, dated Dec. 10, 2009) at 4, ECF No. 18-5; Pl.'s Dep. at 164:14–165:4, ECF No. 16-3.

The plaintiff fell ill once again, and, on January 11, 2010, her medical leave was extended for a second time until March 1, 2010, "[a]ssuming a transfer to another department has occurred." Def.'s Mem., Ex. 5 (Letter from Pl.'s Internist, dated Jan. 11, 2010) at 40, ECF No. 16-3. On January 29, 2010, HUH sent a letter to the plaintiff informing her that her FMLA leave was exhausted and, consequently, the finance department "is no longer able [to] hold [her] position, and must replace [her] with another employee." Def.'s Mem., Ex. 15 ("End of FMLA Leave Letter") at 79, ECF No. 16-3. The letter further indicated that HUH is "[u]nder no obligation to transfer [her] to another position," and if she is "interested in transferring to a different position within the hospital, [she] will need to view the job postings board." *Id.* On February 2, 2010, the plaintiff emailed HR to reiterate that she could not return to work until March 1, 2010 due to medical reasons, and that she was not delaying her return pending a transfer. Def.'s Mem., Ex. 16 (Pl.'s Email to HUH HR, dated Feb. 2, 2010) at 80, ECF No. 16-3. Furthermore, the plaintiff clarified that while "it was [her] physician's desire if possible, that a transfer would be granted," she "had all intention to return to work on March 1, 2010," even if a transfer were not possible. *Id.*

In response to the plaintiff's indication that she would, if all else failed, return to her position as executive assistant in the finance department, HR inquired whether the Deputy CFO or the CFO were interested in having her back, noting at the same time that HUH is "not obligated to return her to her same or a similar position." Def.'s Mem., Ex. 18 (HR's Email to CFO and Deputy CFO, dated Feb. 2, 2010) at 87, ECF No. 16-3. Citing the plaintiff's desire,

"made [] clear over an extended period of time[,] that she does not want to work in Finance permanently," both the CFO and Deputy CFO declined to offer the plaintiff her job back. *See id.*; Pl.'s Opp'n, Ex. 21 at 8, ECF No. 18-5.

On March 1, 2010, the date on which the plaintiff was cleared to return to work, the plaintiff met with an HR analyst, who told the plaintiff that she was "technically terminated." *See* Pl.'s Opp'n, Ex. 25 (Pl.'s Emails with HUH HR, dated Mar. 29 to Apr. 22, 2010) at 18, ECF No. 18-5. Pl.'s Opp'n, Ex. 27 (Pl.'s Emails to HUH HR, dated June 23, 2010) at 22, ECF No. 18-5; Def.'s Mem., Ex. 8 (Pl.'s Letter to HUH, undated) at 44, ECF No. 16-3. Yet, despite HUH's representations to the plaintiff about her status as "technically terminated" and that HUH had no obligation to find her alternative employment, the record reflects that HUH continued to engage the plaintiff in discussions regarding potential positions.

On or before March 1, 2010, for example, the plaintiff was considered for a temporary position to replace the risk management coordinator in Risk Management, but ultimately no offer was extended to the plaintiff. *See* Pl.'s Opp'n, Ex. 23 (Emails between Dir. Risk Management and HUH HR, dated Mar. 1, 2010) at 13, ECF No. 18-5. By March 29, 2010, the plaintiff was also considered for three other temporary positions, but the plaintiff indicated her lack of interest because "no benefits [would be] involved." Pl.'s Emails with HUH HR, dated Mar. 29 to Apr. 22, 2010 at 20. The plaintiff then interviewed for a position as an administrative assistant to the Chief Information Officer ("CIO"), but the plaintiff, again, indicated her lack of interest because "the level of responsibility" associated with that position was not, in her and her physician's opinion, in her "best interest health wise." *Id.*

Based upon the plaintiff's expressed disinterest in any of the discussed positions, HR referred the plaintiff to someone in Nurse Recruiting. *Id.* at 19. On or around April 7, 2010, the

plaintiff was informed that a "Unit Secretary" position was available in Nursing, one of the departments to which she expressed an interest in transferring. Def.'s Mem., Ex. 7 (Pl.'s Emails to HUH HR, dated Apr. 7, 2010) at 43, ECF No. 16-3. The plaintiff relayed the information to HR, adding that her "physician is in agreement with a modified work assignment," and asked if "any such assignments [were] available to [her] until a suitable permanent position is found." *Id.* HR immediately inquired what the plaintiff meant by "modified." *Id.* Neither party presented any evidence that the plaintiff ever responded to this inquiry. *See* Pl.'s Dep. at 187:20–22 (the plaintiff testifying she does not know whether she responded to HR's inquiry), ECF No. 18-2. In any event, no offer was made or accepted.

Around April 2010, the plaintiff spoke to the HR Director, who told her that he was tasked, by the HUH CEO, to "bring[ her] back into the family," and to find her a less stressful position. Pl.'s Letter to HUH, undated at 45. He asked if she would be willing to take a $10,000 pay cut, which she rejected because she felt "as though [she] was being penalized for getting sick and that [she] earned every penny [she] made." *Id.*

On June 18, 2010, more than three months after the plaintiff had been cleared to return to work and more than eight months after the plaintiff first took medical leave, the plaintiff met with an HR analyst who told the plaintiff that HUH would do nothing further to aid the plaintiff and that she should resign. Pl.'s Dep. at 190:14–18, ECF No. 18-2; Def.'s SMF ¶ 16; Pl.'s Emails to HUH HR, dated June 23, 2010 at 22. On June 23, 2010, the plaintiff sent an email to the HR analyst indicating that she would like to be terminated. Pl.'s Emails to HUH HR, dated June 23, 2010 at 22. Shortly thereafter, on July 8, 2010, HUH sent the plaintiff her termination letter, informing her that, though "the Office of Human Resources has made a diligent effort to place [her] in a position comparable to the position [she] held prior to the exhaustion of [her]

family medical leave benefit," HUH did not "identif[y] a position that would meet [her] requirements of 'no high stress areas' at an annual salary of $60,000 per year." Def.'s Mem. 10 ("Termination Letter") at 58, ECF No. 16-3.

At some time prior to July 12, 2011,[2] the plaintiff lodged a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") against HUH alleging that "she was approved for leave under the DC Family and Medical [Leave] Act (hereinafter FMLA) on November 17, 2009," but was "discharged on February 2, 2010 even though 'FMLA had not run out,'" and that she had been discriminated for both disability and her age, in violation of the ADA and the Age Discrimination in Employment Act of 1967, respectively. Pl.'s Opp'n, Ex. 22 ("HUH's Position to EEOC, dated July 12, 2011") at 9, ECF No. 18-5. More than three years later, the plaintiff filed her complaint alleging only violations of the ADA. *See generally* Compl. The parties began discovery on February 26, 2015, and, after two extensions, completed discovery on October 1, 2015, seven months later. *See* Minute Order, dated Feb. 26, 2015; Minute Order, dated June 30, 2015; Minute Entry, dated September 9, 2015. After an unsuccessful effort to mediate a resolution of this lawsuit, HUH filed the instant motion for summary judgment, which is now ripe.

---

[2]       The plaintiff has neither alleged nor submitted any documentation showing that she timely exhausted her administrative remedies as required under the ADA. 42 U.S.C. § 12117(a) (incorporating by reference the administration exhaustion requirement set out in 42 U.S.C. § 2000e-5). While the record reflects that the plaintiff submitted a complaint to the EEOC alleging discrimination in violation of the ADA, the record does not indicate when that complaint was filed, whether it was within the statutorily required timeframe, or whether the plaintiff waited for final resolution from the EEOC and a right-to-sue letter before instituting the instant lawsuit. *See* Pl.'s Opp'n, Ex. 22 (HUH's Position Statement to EEOC, dated July 12, 2011) at 9–12, ECF No. 18-5. Failure to timely administrative exhaust under the ADA is not jurisdictional, however, and may be raised as an affirmative defense, for which the defendant bears the burden of proof. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Brown v. Marsh*, 777 F.2d 8, 18 (D.C. Cir. 1985). The defendant has not asserted such a defense here and, consequently, the issue of administrative exhaustion is not addressed.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see* FED. R. CIV. P. 56(c), (e)(2)–(3); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)); *see also McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (declining in employment discrimination case to rely on affidavit containing statement that "would be pure hearsay" and "'therefore counts for nothing' in an opposition to summary judgment" (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000))); *Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks omitted)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve

genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor,'" *id.* at 1863 (quoting *Liberty Lobby,* 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Prod.s, Inc.,* 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Burley v. Nat'l Passenger Rail Corp*., 801 F.3d 290, 296 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 251– 52, and cannot rely on "'mere allegations'" or conclusory statements, *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)); *see also Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III. DISCUSSION

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability," including by "not making reasonable accommodations to the known physical

or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(a) and (b)(5)(A). The ADA defines the term "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Thus, "[t]o avert summary judgment, [the plaintiff has] to come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the [ADA], (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability." *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (internal citations omitted).

The plaintiff asserts two counts of failure to provide reasonable accommodation in violation of the ADA against HUH. In Count I, the plaintiff alleges that HUH violated the ADA by refusing to permit her to return to her previous position as the executive assistant to the CFO and Deputy CFO, "or another position Plaintiff had identified," after she was medically cleared to return to work by her doctor. Compl. ¶¶ 22–29 (Count I). In Count II, the plaintiff reiterates the same grievance but identifies a specific position in Risk Management to which HUH allegedly denied her transfer request as a reasonable accommodation. *See id.* ¶ 30. In other words, Count I subsumes Count II, and, as a result, both counts will be discussed together.

In moving for summary judgment, HUH contests only the last two elements of the plaintiff's ADA claims, conceding, for the purposes of summary judgment, that the plaintiff is disabled within the meaning of the ADA and that HUH had notice of her disability and her desire

for an accommodation. Def.'s Mem. at 11. Thus, to defeat summary judgment, the plaintiff

must produce enough evidence of genuine issues of material fact such that a reasonable jury

could conclude that she was a "qualified individual" and that HUH refused to accommodate her

disability. HUH's arguments as to each of these remaining two elements are discussed *seriatim*

below.

A.     *Element 3*: **Whether The Plaintiff Was a "Qualified Individual" Able to Perform the Essential Functions of Her Job With or Without Reasonable Accommodation**

HUH contends that the plaintiff is not a qualified person, relying solely on the letters

submitted by her physicians giving the plaintiff medical clearance to return to work. Def.'s

Mem. at 12. Based on the record before the Court, HUH's position is unavailing.

*1.     Applicable Legal Principles*

As defined by the ADA, the plaintiff is considered a "qualified person," if she can, with

or without reasonable accommodation, perform the "essential functions of the employment

position that [she] holds or desires." 42 U.S.C. § 12111(8). In other words, "'an individual with

handicaps is 'qualified' if she can perform the essential functions of her position with reasonable

accommodation. If she can perform these functions *without* reasonable accommodation, so

much the better—she is, of course, still qualified.'" *Ward v. McDonald*, 762 F.3d 24, 28 (D.C.

Cir. 2014) (emphasis in original) (quoting *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994)). The

plaintiff has the burden of establishing "her ability to perform those functions (with or without

reasonable accommodation) at the time the employer denied her request for accommodation."

*Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015).

To meet its obligation under the ADA to evaluate whether a person is "qualified" for a

position, "an employer needs information about the nature of the individual's disability and the

desired accommodation—information typically possessed only by the individual or her physician." *Ward*, 762 F.3d at 31. Thus, "an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." *Id.* at 31–32 (internal quotations and citation omitted).

Although the D.C. Circuit has not opined on this issue, other Circuits have required the employer, when evaluating the reasonableness of a requested accommodation, to conduct an "individualized" assessment of whether an employee or prospective employee is in fact unable to perform the essential functions of his or her position, instead of "slavishly defer[ring] to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 31 (1st Cir. 2002) (citing *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) and *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000)); *see also Class v. Towson Univ.*, 806 F.3d 236, 255 (4th Cir. 2015); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 484 (5th Cir. 2006); *Equal Employment Opportunity Comm'n v. Howard Univ.*, 70 F. Supp. 3d 140, 150 n.5 (D.D.C. 2014) (noting "that there is some authority that suggests that defendant should have made an 'individualized inquiry' into [the plaintiff's] ability to perform the 'essential functions' of the jobs before it decided not to hire him" (citing *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013); *Holiday*, 206 F.3d at 643; *Gillen*, 283 F.3d at 29)).

Of course, "obtaining a physician's detailed assessment" of an employee's medical restrictions "and then acting in accordance with it can be persuasive evidence that an employer has based its decision on an individualized inquiry," *Gillen*, 283 F.3d at at 31 (citing *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 443–44 (6th Cir. 1991) and *Bento v. I.T.O. Corp.*, 599 F. Supp. 731, 744–45 (D.R.I. 1984)), and may even be "enough to justify summary judgment,"

in certain instances, *id.* For example, in *Wulff v. Sentara Healthcare, Inc.*, 513 F. App'x 267, 270–71 (4th Cir. 2013), cited by HUH as "squarely on point with the case *sub judice*," Def.'s Mem. at 14, the Fourth Circuit found that the employer was "entitled" to accept as true the no-lifting restriction listed on the Physical Capacities Form completed by the plaintiff's physician to conclude that the plaintiff was not a qualified person who could perform a job requiring lifting. The mere existence of "*an* opinion," however, "does not automatically absolve the employer from liability under the ADA," *Gillen*, 283 F.3d at 31 (citing *Bragdon*, 524 U.S. at 650) (emphasis added).

### 2. *Analysis*

As noted, HUH relies solely upon the physicians' letters stating that a transfer to a less stressful position is "recommend[ed]" and that the plaintiff may return to work "[a]ssuming a transfer to another department has occurred" to demonstrate satisfaction of its obligation under the ADA to make an individualized inquiry into whether the plaintiff is a qualified person. Def.'s Mem. at 12–13 ("Defendant was entitled to rely upon the November 9, 2009, December 2, 2009, and January 11, 2010 letters provided by Plaintiff's Physicians. The three letters—from two different treating physicians—unequivocally state that Plaintiff could not return to her pre-stroke position as an Executive Assistant in the Finance Department."). Contrary to HUH's position, however, the physician's letters fall far short of demonstrating that the plaintiff is not a "qualified individual" and, in any event, do not appear to have played a role in HUH's denial of her request to return to her pre-stroke position.

First, the physicians' letters hardly amount to a "detailed assessment" of the plaintiff's disability and desired accommodation sufficient to justify summary judgment in favor of HUH. In contrast to the Physical Capacities Form in *Wulff*, which laid out the specific medical

restriction suffered by the plaintiff, the physicians' letters relied upon by HUH are no longer than 4 sentences in length and describe in broad, cursory terms that the plaintiff should be transferred to a "less stressful department." *See* Letter from Pl.'s Neurologist, dated Nov. 9, 2009 at 2; Letter from Pl.'s Neurologist, dated Dec. 2, 2009 at 39; Letter from Pl.'s Internist, dated Jan. 11, 2010 at 40. The letters do not detail what the plaintiff's actual medical limitations are or what would constitute a "less stressful" position, in comparison to the essential functions of the plaintiff's pre-stroke position as an executive assistant in the finance department.

By contrast to the physicians' letters relied upon by HUH, the plaintiff's neurologist provided additional detail regarding the plaintiff's medical restrictions elsewhere. In the plaintiff's FMLA Application, which she submitted to the HUH HR department, her neurologist clearly stated that the plaintiff's medical restriction is that she "needs [a] job with less stress," and that her limitation is that she "cannot work [more than] 40 hrs per week." FMLA App. at 41; Pl.'s Emails with HUH HR, dated Nov. 11–13, 2009 at 42 (plaintiff writing, on November 13, 2009, "I came to the Hospital yesterday and submitted FMLA and Short Term Disability forms"). In response to the question whether he would "recommend vocational counseling and/or rehabilitation or *job modification*," the plaintiff's neurologist referred the reader to the "above restrictions/limitations," indicating that he recommends a job modification to a job that does not require the plaintiff to work more than forty-hours a week. FMLA App. at 41 (emphasis added). Thus, drawing all justifiable inferences in favor of the plaintiff, as the nonmoving party, a reasonable jury could find that HUH was made aware that the plaintiff's medical restrictions amounted to limiting her work week to no more than forty hours, not that she could not work in the finance department at all.

Second, the plaintiff has adduced evidence indicating that HUH did not actually act in accordance with medical advice and, instead, prohibited the plaintiff's return to her pre-stroke position for other reasons. Specifically, evidence suggests that the plaintiff was not allowed to return to her previous position simply because her previous supervisors no longer wanted to work with her, rather than due to any belief that she was medically restricted from doing so. *See* HR's Email to CFO and Deputy CFO, dated Feb. 2, 2010 at 87 (the CFO stating the plaintiff "has made it clear over an extended period of time that she does not want to work in Finance permanently of a variety of reasons. I think it would be better for all involved if she concentrated on looking for something else and we pursued a new administrative asst"); Pl.'s Opp'n, Ex. 21 at 8 (the Deputy CFO stating "[w]e have decided that she should go ahead and pursue other opportunities and not return to our department"). Significantly, HUH never reached out to the plaintiff's neurologist or requested any additional medical information to ascertain in more detail the exact nature of the plaintiff's medical restrictions and whether any accommodations could be made that would permit her to perform her job. *See* Pl.'s Opp'n, Ex. 3 ("Pl.'s Neurologist Dep.") at 36:20–37:1 ("Q: Did you have any communications directly with anyone at Howard University with Regard to her position or job? A. No."), ECF No. 18-2; *id.* at 43:15–44:12 ("I don't recall [HUH] talking to me, but I would usually have documented something like that if I had received a call"). HUH's post-hoc justification is further undermined by the HR analyst's deposition testimony that at the time, HR did not believe the plaintiff to have a disability, qualifying her for protection under the ADA, at all. Pl.'s Opp'n, Ex. 4 ("HUH HR Analyst's 30(b)(6) Dep.") at 64:12–13 ("No, we did not deem [the plaintiff] to have a physical disability."), ECF No. 18-3.

Consequently, HUH fails to meet its burden of showing that no issue of material fact exists as to whether the plaintiff was capable of performing the essential functions of her position, with or without reasonable accommodations.

**B.** ***Element 4*: Whether the HUH Denied the Plaintiff's Requests for Reasonable Accommodation**

HUH next argues that it is entitled to summary judgment because the plaintiff cannot prove, as a matter of law, that HUH denied her requests for reasonable accommodation. Again, although this is a close call, a reasonable jury considering the proffered evidence could conclude that HUH failed to live up to its obligations in assisting the plaintiff to transfer and also cut short the iterative process for considering the plaintiff's request for reasonable accommodation when it terminated her from her pre-stroke position.

### 1. *Applicable Legal Principles*

Under the ADA, an employer is required to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual . . . unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). The employer is not required, however, to "provide an employee that accommodation [s]he requests or prefers[;] the employer need only provide some reasonable accommodation," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)), which may include "modified work schedules" or "reassignment to a vacant position," 42 U.S.C. § 12111(9)(B).

When the requested accommodation is reassignment, an employer does not dispense with its obligation to provide a reasonable accommodation under the ADA if the employer merely allows "an employee to apply for a job on the same basis as anyone else," reasoning that,

otherwise, "the ADA's reference to reassignment would be redundant if permission to apply were all it meant." *Aka*, 156 F.3d at 1304. While the Supreme Court's opinion in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002), holding that reassignment may be unreasonable if it interferes with the employer's seniority system, may call into question the *Aka* Court's holding that the ADA does not intend for "disabled employees [to] be treated exactly like other job applicants," absent clear guidance on this issue, this Court continues to be bound by the D.C. Circuit's decision in *Aka*. *See Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 82–83 (D.D.C. 2008) (noting that "[w]hile the question whether an employer is required by the ADA and the Rehabilitation Act to reassign a disabled employe[e] to a vacant position for which a more qualified applicant is available is a difficult one upon which the Circuits have split, this Court is bound by the D.C. Circuit's decision on this issue in *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)" (citations omitted)).

In order to determine "'what accommodation would enable the employee to continue working,'" the employer and the employee are required to engage in an interactive, "'flexible give-and-take'" process. *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). "'[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.'" *Id.* (quoting *Sears*, 417 F.3d at 805) (alteration in original). Thus, on summary judgment, courts are instructed to scour the record, *see Alexander v. Wash. Metro. Area Transit Auth.*, 2016 U.S. App. LEXIS 11558, at 9–14 (D.C. Cir. 2016) (per curiam), to "'look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary,'" *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805). "In sum, to establish that her request was 'denied,' [the plaintiff] must show either that the

[employer] in fact ended the interactive process or that it participated in the process in bad faith." *Id.*

### 2. *Analysis*

HUH here does not contest that the plaintiff requested a reasonable accommodation in the form of a transfer to a less stressful position or argue that such reassignment would "impose an undue hardship" on HUH. Instead, HUH disputes that the plaintiff was denied her requested reasonable accommodation because "[a]s soon as Plaintiff was medically cleared to return to work on March 1, 2010, Defendant engaged in a four-month process to reassign her." Def.'s Mem. at 15. HUH points to evidence demonstrating that the plaintiff discussed with various people within HUH regarding (1) "temporary positions," which the plaintiff rejected for lack of benefits; (2) an administrative assistant position with the CIO, which the plaintiff rejected because she understood that it would be too stressful; (3) a unit secretary position within the Nursing Department, which the plaintiff had identified as a less stressful department but for which the plaintiff asked for a "modified work schedule" and apparently failed to clarify what such a modified work schedule might be; and (4) positions that required a $10,000 pay cut, which the plaintiff rejected because she "felt as though [she] was being penalized for getting sick and that [she] earned every penny that she [made]." *Id.* at 15–16 (internal quotations omitted). Finally, about four months after HUH alleges that the interactive process began, the plaintiff was terminated because no position could be identified "that would meet [the plaintiff's] requirements of 'no high stress areas' at an annual salary of $60,000 per year." Termination Letter at 58. HUH lays at the plaintiff's feet the responsibility for the breakdown of the interactive process.

The plaintiff's account of the "interactive process" is quite different. She questions whether HUH adequately participated in the "interactive process" required by the ADA because, instead of viewing the plaintiff as an disabled employee covered by the ADA, "Defendant did not believe it had any obligation to assist Plaintiff with her efforts to return to work and, only allowed her to remain on the rolls so she could conduct her own job search." Pl.'s Opp'n at 10–11. The record contains several pieces of evidence supporting the plaintiff's critique of the reasonableness of HUH's participation in the interactive process.

First, communications confirm HUH's view that it had "no obligation" to assist the plaintiff in finding a position accommodating her medical restriction of working only a 40-hour week. For example, HUH's letter to the plaintiff regarding her FMLA leave, expressly denies any obligation to assist the plaintiff in her search for a reassignment position. *See* End of FMLA Leave Letter at 79 ("The hospital is under no obligation to transfer you to another position. If you are interested in transferring to a different position within the hospital, you will need to view the job postings board which is located across from the Personnel Office and apply for positions for which you are qualified."); *see also* Deputy CFO's Email to Pl., dated Jan. 16, 2009 at 6 ("According to HR, we have no responsibility in transferring any employee. Employees go to the bulletin board to search for themselves any opportunity that suits them and then applies for it."); HR's Email to CFO and Deputy CFO, dated Feb. 2, 2010 at 87 ("However, due to the fact that she has been out for such an extended period of time, she has exhausted her allotment of Family Medical Leave Act benefits. This means that we are not obligated to return her to her same or a similar position."). Indeed, despite discussions regarding potential positions, the plaintiff was never officially "offered" any of them, and, in fact, was required to interview for the position of administrative assistant to the CIO. *See* Pl.'s Dep. at 191:5–16; 192:12–193:5

("Question: And if I understood your testimony, to your knowledge neither you nor they were able to identify a vacant position that was acceptable to you for you to fill, correct? . . . A: It wasn't that it wasn't acceptable to me. I wasn't given any offers.").

Second, the plaintiff has raised an issue of material fact as to whether the position as an administrative assistant to the CIO was presented in good faith. The plaintiff testified that "the first thing that [the CIO] told me was that the job was stressful. It's a stressful position. That's what the first thing that came out of his mouth. In that conversation with [an HR analyst], he was upset that they even had me interview with [the CIO] because of the stress level in the area." Pl.'s Dep. at 181:18–182:2, ECF No. 18-2.

Third, the plaintiff argues that HUH failed to participate in the interactive process by failing to discuss with her possible reasonable accommodations that would permit her to return to her previous position in the finance department. Pl.'s Opp'n at 17. Even though HUH had been put on notice that the plaintiff suffered from a medical condition that limited her ability to work in high-stress jobs and that she required an accommodation such that she worked no more than forty-hours per week, FMLA App. at 41, HUH never considered whether such a modified work schedule would permit the plaintiff to return to her pre-stroke position in the finance department.

For example, when HUH HR broached the topic of the plaintiff's return to the finance department, both the CFO and the Deputy CFO rejected the possibility of her return without any apparent consideration of whether any reasonable accommodations—such as a modified work schedule—would be feasible. *See* HR's Email to CFO and Deputy CFO, dated Feb. 2, 2010 at 87; Pl.'s Opp'n, Ex. 21 at 8. Despite HUH's apparent concession on this motion that the plaintiff is disabled under the ADA, *see generally* Def.'s Mem. at 11, the handling of the plaintiff's requests throughout the period at issue is consistent with HUH HR's view then that the plaintiff

was not a disabled person covered by the ADA, and, thus, no legal obligation was triggered to return her to her previous or any other comparable position.  *See e.g.*, End of FMLA Leave Letter ("Our records indicate that you have been away from work since October 2009.  Due to the fact that you have not returned, your department is no longer able to hold your position."); HR's Email to CFO and Deputy CFO, dated Feb. 2, 2010 ("However, due to the fact that she has been out for such an extended period of time, she has exhausted her allotment of Family medical Leave Act benefits.  This means that are not obligated to return her to her same or a similar position."); HUH HR Analyst 30(b)(6) Dep. at 81:18–82:4 ("Q: Was any consideration given to modifying the position in Finance so that [the plaintiff], as she communicated, could go back into the position in Finance as of March 1ˢᵗ, 2010? . . . The Witness: No. ").

Lastly, the plaintiff argues that HUH was at fault for the breakdown of the interactive process by refusing to transfer her to the available position of risk management coordinator in Risk Management.  The parties agree that a reasonable accommodation under the ADA includes "reassignment to a *vacant* position," 42 U.S.C. § 12111(9)(B) (emphasis added), and cite the D.C. Circuit's opinion in *McFadden v. Ballard Spahr Andrews & Intersoll, LLP*, 611 F.3d 1, 5 (D.C. Cir. 2010) for the proposition that a position is vacant if "the employer treated the position as vacant," Def.'s Mem. at 19; Pl.'s Opp'n at 17.  The parties disagree as to whether the risk management coordinator position was vacant.  Pl.'s Opp'n at 17–18.

HUH contends that the risk management position was not vacant because between March 1, 2010, when the plaintiff was medically cleared to return to work, and July 8, 2010, when the plaintiff was terminated, the position was still occupied by the existing risk management coordinator, who was merely out on medical leave.  Def.'s Mem. at 20.  In support, HUH points to testimony from the Director of Risk Management stating that at no time during this time

period did she think that she could replace the existing person with another permanent employee. *Id.* at 20–21 (quoting Dir. Risk Management 30(b)(6) Dep. at 26:17–18:11, ECF No. 16-3). The Dir. Risk Management until September 2010. *Id.* at 21 (quoting Dir. Risk Management 30(b)(6) Dep. at 19:13–21).

The plaintiff, however, has presented evidence to the contrary. Around March 1, 2010, the Director of Risk Management sent an email to HUH HR indicating that she was considering the plaintiff for the risk management coordinator position, but she was hesitant to do so because the Deputy CFO, the plaintiff's previous supervisor, raised "performance issues related to [the plaintiff's] attitude, response to stress, etc." Emails between Dir. Risk Management and HUH HR, dated Mar. 1, 2010 at 13. This email indicates that as early as March 1, 2010, the Director of Risk Management considered the risk management coordinator position available, and, in fact, had considered the plaintiff for that role pending resolution of the performance issues raised by the Deputy CFO. The plaintiff corroborates the status of the position as vacant, testifying that the Director of Risk Management told her that because the risk management coordinator "was sick and was going to be out for a long time[, she] would be transferred in that position." Pl.'s Dep. at 142:18–21, ECF No. 18-2.

While HUH is correct that it is not obligated to reassign the plaintiff to the position she prefers, Def.'s Reply at 15, ECF No. 19, the plaintiff has adduced sufficient facts for a reasonable juror to be able to find that HUH "'ended the interactive process or that it participated in the process in bad faith,'" *Minter*, 809 F.3d at 69 (quoting *Ward*, 762 F.3d at 32). Whether the employer or the employee is at fault for the breakdown of the interactive process is a fact-intensive process. Here, both parties have presented alternative perspectives on this issue. Ultimately, however, the moving party bears the burden of persuasion that no issues of material

fact exists and that it is entitled to summary judgment as a matter of law.  HUH fails to do so here.  *Cf. Alexander*, 2016 U.S. App. LEXIS 11558, at *6 (reversing grant of summary judgment to defendant employer Washington Metropolitan Area Transit Authority ("Authority"), due to "central error [] in failing to consider at all whether the Authority 'regarded'" the plaintiff as having a disability due to his long-term alcoholism).  Accordingly, HUH's motion for summary judgment is denied.

**IV.     CONCLUSION**

For the foregoing reasons, HUH's Motion for Summary Judgment is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 29, 2016

_____
BERYL A. HOWELL
Chief Judge